IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00120-RBJ-04

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. NEIL PERKINS,
2. PATRICK WILLIAMS,
3. FRANK BEDOLOTO,
**4. POWERLAB NUTRITION LLC**, and
5. REACTION NUTRITION LLC

    Defendants.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Jaime Pena, Assistant United States Attorney for the District of Colorado, and the defendant, Powerlab Nutrition LLC by its counsel, Fredric M. Winocur, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

### I. AGREEMENT

Defendant Powerlab Nutrition LLC agrees to plead guilty to Count One of the Indictment charging a violation of Title 18, United States Code, Section 371, Conspiracy to Defraud the United States and Violate the Food, Drug and Cosmetics Act.

COURT EXHIBIT 1

The defendant agrees to fully and truthfully cooperate with the government, designated public health agencies, and law enforcement authorities, and encourage its employees, officers and representatives to do the same. The information and testimony resulting from the foregoing requirements will not be used against the defendant at sentencing pursuant to USSG §1B1.8, if it and its representatives continue to cooperate truthfully with the government. Information and testimony relating to involvement in crimes of violence, computer-related crimes, or crimes involving minors, if any, are excluded from this agreement. "Crimes of violence," as the term is used here refers to the traditional Common Law meaning of the term.

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, in exchange for the concessions made by the government in this agreement, and in consideration for not filing additional charges in this case, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty of $500,000.00; (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 4; or (3) the government appeals the sentence imposed. If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1)

the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.

Should the defendant meet his obligations pursuant to this plea agreement, the government may, in its sole discretion and pursuant to the factors in 18 USC 3553(a) make a sentencing recommendation to the Court of a **fine of $100,000.00.**

## II. ELEMENTS OF THE OFFENSE(S)

The parties agree that the elements of the offenses to which this plea is being tendered are as follows:

**Conspiracy to Defraud the United States and Violate the Food, Drug and Cosmetics Act (18 U.S.C. § 371) - COUNT 1**

*First:* there was an agreement between two or more persons to defraud the United States by obstructing the lawful functions of the Food and Drug Administration by deceitful or dishonest means as charged in the indictment; or there was an agreement between two or more persons to violate the Food, Drug and Cosmetics Act in relation to the introduction of unapproved new drugs into interstate commerce with the intent to mislead or defraud. (Note: All the substances described in the indictment constitute new drugs pursuant to the FDCA);

*Second:* the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it;

*Third:* one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy; and,

*Fourth*: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

9th Circuit Pattern Jury Instructions; see also 3rd Circuit Pattern Jury Instructions.
10th Circuit Pattern Jury Instructions, No. 2.87 (2006) (MODIFIED based on Controlled Substances Conspiracy)

## III. STATUTORY PENALTIES

The maximum statutory penalty for Count One, **Conspiracy to Defraud the United States and Violate Laws of the United States** [to Introduce Into Interstate Commerce an Article in Violation of 21 U.S.C. §§ 331(d), 355 (relating to the application and approval of new drugs) and § 333(a)(2) (relating to the offense being committed with an intent to mislead or defraud)], violations of Title 18, United States Code, Sections 371 and Title 21, United States Code, Sections 331(d), 333(a)(2) and 355, is a term of imprisonment of not more than 5 years imprisonment (although not applicable to a corporate entity), not more than $500,000 fine, or both; up to 3 years supervised release; and a $400 Special Assessment fee, as to a corporate entity.

## IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of other rights.

## V. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea that the defendant will

tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below that are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies those facts that are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts that do not contradict facts to which the parties have stipulated and that are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began is around 2008, and that the relevant conduct continued through September 2012.

The parties agree as follows:

Around 2008, the owner of a local Colorado nutrition store (herein referred to as "CR") established Powerlab Nutrition LLC ("Powerlab" herein) as a Colorado corporation for the purpose of distributing body-building products throughout the United States. At the time, Neil Perkins was the manager of the nutrition store in Colorado and was at all times authorized to act on behalf of Powerlab and CR in obtaining the products that contained chemicals and substances distributed under the Powerlab trade names. Acting together and in furtherance of the objectives of making a profit and violating the law, CR and Neil Perkins contacted and agreed with Patrick

5

Williams and Frank Bedoloto to have their company, Reaction Nutrition LLC, (1) import from China (to that business in Pennsylvania) the chemicals necessary to produce the Powerlab products, (2) bottle and label the Powerlab products in Pennsylvania, (3) distribute the Powerlab products by sending them from Pennsylvania to Colorado for further distribution throughout the United States. Thereafter, acting together and interdependently, the defendants marketed and distributed the new drugs described in the Indictment throughout the United States. In furtherance of their agreement and conspiracy, the defendants conducted each of the overt acts described in the indictment, including (1) communicating with each other and customers via email, (2) importing chemicals from China, (3) sending Powerlab products from Pennsylvania to Colorado for further distribution, (4) making false representations in the labeling of the Powerlab products, and (5) making false statements to the FDA and consumers regarding the nature of the Powerlab products.

      Patrick Williams and Frank Bedoloto, acting as principles and representatives of Reaction Nutrition LLC, ran a manufacturing facility in Pennsylvania that imported chemicals from China in order to manufacture, package and distribute a number of muscle-building products for customers like Powerlab, CR and Neil Perkins. Those products were shipped throughout the United States to places like Colorado. Neil Perkins, as a representative of Powerlab Nutrition LLC, ordered and received the muscle-building products for sale through a retail store in Colorado. He ordered the products, received the shipments from Pennsylvania, and further distributed the products to consumers. Between 2009 and 2012, Neil Perkins, individually and as an authorized representative of Powerlab, regularly ordered the labeling, bottling and distribution

(from Pennsylvania to Colorado) of synthetic steroid Powerlab products via e-mail and telephonic communications with Patrick Williams and Reaction Nutrition. Those products were thereafter shipped by Reaction Nutrition LLC, Patrick Williams and Frank Bedoloto in interstate commerce from Pennsylvania to Colorado, and received in Colorado by Powerlab and Neil Perkins. The labeling on all those products falsely represented the contents were dietary supplements to create the impression the substances were legally sold and safe for consumer consumption. Customers for these types of muscle-building products included high school athletes and body-builders.

Between 2009 and 2012, Powerlab, CR, Perkins, Williams, Bedoloto and Reaction Nutrition LLC knowingly devised and executed a scheme to defraud the FDA and consumers, and defeat the lawful functions of the FDA, by misrepresenting the contents of the Powerlab products as merely a "dietary supplement" when in fact it was a new drug that was not approved or subjected to the new drug application process of the Food and Drug Administration, in violation of 21 U.S.C. §§ 331(d), 333(a)(2) and 355. The chemicals imported from China were known to each of the above individuals and entities to be unapproved new drugs that had never been tested for safety and efficacy, and were subject to regulation in the United States by the Food and Drug Administration (FDA). Those same chemicals were then combined with other substances to create muscle-building products that were shipped from Pennsylvania to Colorado and subsequently sold through retail outlets and over the internet, including in Colorado.

The Powerlab products included trade names such as Epitest, Androdrol, Androdrol Extreme, Primabol, Halotren, and Halotest-25 which were all products distributed or caused to

be distributed by the defendants throughout the United States. The products were represented to contain one or more of the following synthetic steroids:

- 4-chloro-17a-methyl-androst-1,4-diene-3-17b-diol
- 2a,3a-epithio-17a-methyl-5a-androstan-17b-ol
- 13-ethyl-3-methoxy-gona-2,5(10)dien-17-one
- 2a-17a-dimethyl-17b-hydroxy-5a-androstan-3-one
- 4-chloro-17-a-methyl-andro-4-ene-3,17b-diol.

Androdrol and Androdrol Extreme were also labeled as containing 6-bromoandrostenedione (6-bromo), which is a synthetic steroidal inhibitor of estrogen synthesis. The labeling for Epitest, Androdrol, Androdrol Extreme, Primabol, Halotren, and Halotest-25 claimed that the product as a whole or the synthetic ingredient or ingredients listed on their respective labeling would affect the structure or function of the body. Epitest, Androdrol, Androdrol Extreme, Primabol, Halotren, and Halotest-25 were drugs and new drugs that required FDA-approval before they could be lawfully distributed in interstate commerce. The FDA has never approved Epitest, Androdrol, Androdrol Extreme, Primabol, Halotren, or Halotest-25 for lawful use in the United States. Similarly, the labeling for those new drugs was never approved by the FDA either. Epitest, Androdrol, Androdrol Extreme, Primabol, Halotren, Halotest were misbranded within meaning of 21 U.S.C. 352(a) in that their labeling falsely and misleadingly identified them as "dietary supplements" and legal products when none of these products were actually "dietary supplements" or legal.

These products were shipped in interstate commerce for pay from Pennsylvania to Colorado on numerous occasions between 2009 and 2012, including but not limited to the following occasions:

| "On or About" Date of Invoice or Shipment | Invoice Number | Misbranded Drug | Shipped From | Shipped To |
|---|---|---|---|---|
| 5/10/2011 | 841 | Primabol | Pennsylvania | Colorado |
| 8/8/2011 | 1425 | Androdrol | Pennsylvania | Colorado |
| 1/2/2012 | 2398 | Halotest-25 | Pennsylvania | Colorado |
| 2012 | | Epitest | Pennsylvania | Colorado |

During the period of the conspiracy alleged, Powerlab and the defendants distributed over $2.5 million dollars of the above synthetic steroids. The synthetic steroids were by far the most profitable products sold through the Colorado retailer.

The chemicals in the Powerlab products constituted new drugs that were unapproved by the FDA. Contrary to the law and the FDA, the products were marketed as "dietary supplements" in order to circumvent the FDA's regulatory authority over drugs and new drugs, and to conceal their true identity as new drugs. Additionally, those new drugs were never the subject of a new drug application or the approval process of the FDA as required by law.

The defendants, in an effort to avoid law enforcement scrutiny, monitored the Controlled Substances lists to avoid the DEA, and monitored FDA cases involving body-building to gauge their criminal exposure. They knew the chemical compounds in the Powerlab products were subject to scrutiny by a number of government law enforcement agencies, including the Food and Drug Administration (FDA), the Department of Homeland Security, and the Drug Enforcement Administration (DEA). The tested samples from the execution of the search

warrant, and several undercover buys, were determined to contain steroids or synthetic steroids. All the products therefore were new drugs. Some of the products tested contained substances that were subsequently added to the Controlled Substances lists by the DEA; and at least two of the tested products contained substances were already on the Controlled Substances list.

The parties further stipulate that a plea by this corporate entity does not imply liability by its present individual owners, shareholders or members. During the course of the conspiracy, Powerlab was an entity owned and controlled by CR. CR died in 2012 and the entity was bequeathed to his parents, Dorothy and Phil Roseberry (the Roseberry's). The Roseberry's had no prior involvement in the management of Powerlab, and at the time were retired and living in Florida. They relied heavily on Neil Perkins to manage the day to day affairs of Powerlab following their son's death. From the time of the execution of the search warrant in 2012, the Roseberry's have cooperated with the investigation and prosecution of the case. Accordingly, the Government recognizes that the Roseberry's were not personally involved in the offense conduct.

## VI. ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

A. The guideline provision applicable to this offense is USSG § 2N2.1 (the base offense level is also 6 if USSG 2B1.1(a)(2) is applicable because there is no loss estimation based on the available evidence). Therefore, the base offense level is 6.

B. There is no aggravating role pursuant to USSG §3B1.1 because there is no evidence the defendant directed others in the criminal offense. The offense level remains 6.

C. Pursuant to USSG § 3E1.1(a), defendant has clearly demonstrated acceptance of responsibility as to the allegations. A two-level downward adjustment results in an offense level of 4.

D. Because the defendant is an organization, the provisions of Chapter 8 apply in the determination of a fine.

E. Pursuant to USSG § 8A1.2(b)(2(A), § 8C2.2(b) and its reference to § 8C3.3(b), the parties recognize the corporate entity "…is not able and, even with the use of installment schedule, is not likely to become able to pay the minimum fine required by USSG § 8C2.7 (Guidelines fine range for Organizations) and USSG § 8C2.9 (Disgorgement). It is virtually impossible to calculate pecuniary gain in this case because although the revenue from the product was $2.5 million, it is pure speculation as to what the products would have sold for without the synthetic steroids included in them; and because of the nature of synthetic steroids, no victims have come forward. See reference to § 8A1.2 Application Notes defining "pecuniary gain." Thus, application of USSG § 8C2.4(c) indicates pecuniary gain should not be used to determine the base fine. The parties understand that the base fine based on the 2014 Guidelines, as referenced in the 2015 Application Notes, is $5000.00 for a base offense level of 6 or less. USSG § 8C2.4. Then, after application of the Culpability Score in § 8C2.5, which starts at 5 but

is reduced by 2 pursuant to USSG § 8C2.5(g)(2), the final culpability score is 3. Thereafter, applying the culpability score, the minimum multiplier is .60 and the maximum multiplier is 1.2 pursuant to USSG § 8C2.6; resulting in a fine range of $3000.00 to $6000.00. USSG § 8C2.7.

    F.    The parties agree that although a fine of $6,000.00 is called for by the Guidelines calculations above, a fine of $100,000.00 pursuant to the application of the 18 USC § 3553(a) factors is appropriate.

The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the

advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 8/23/16

_____
Phil Roseberry, as Chief Executive Officer and Duly Authorized Representative of Powerlab LLC, Defendant

Date: 8/23/16

_____
Fredric M. Winocur, Attorney for Defendant

Date: 8/23/16

_____
Jaime Pena, Assistant U.S. Attorney

13